**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

**Kimberly L. Turner**                                                                                              **Plaintiff**

**v.**                                    **CASE NO. 4:13CV00504 JTK**

**Carolyn W. Colvin, Acting Commissioner,**
**Social Security Administration**                                                                         **Defendant**

## ORDER AFFIRMING THE COMMISSIONER

Kimberly L. Turner seeks judicial review of the denial of her application for supplemental security income benefits (SSI). Turner cannot remember the last time she was employed.[1] She previously applied for SSI, and that application was denied at the reconsideration level on March 29, 2011.[2] Turner reapplied on May 1, 2012,[3] with an alleged onset date of January 1, 1994.[4] Because SSI benefits cannot be granted prior to the date of application, however, the alleged onset date is May 1, 2012. Turner bases disability on depression, hepatitis C, short term memory loss, mood disorder, carpal tunnel in left arm, high blood pressure, anxiety disorder and a broken left foot.[5]

**The Commissioner's decision.** The Commissioner's ALJ determined that Turner did not engage in substantial gainful activity since applying for SSI.[6] Turner has severe impairments -

---

[1] SSA record at p. 40.

[2] *Id*. at p. 138.

[3] *Id*. at p. 115.

[4] *Id*.

[5] *Id*. at p. 148.

[6] *Id.* at p. 13.

1

left foot fracture status post-surgery, T4 burst fracture status post-surgery, right arm fracture status post-surgery, degenerative disc disease, left carpal tunnel syndrome, brachial neuritis/radiculitis, mood disorder, anxiety disorder, personality disorder and a history of substance abuse.[7] None of Turner's severe impairments meet the listings.[8] The ALJ determined that Turner can perform light work except she can perform only occasional stooping, crouching, crawling and kneeling; cannot perform overhead reaching with the right upper extremity; can perform work where interpersonal contact is incidental to the work performed; and can perform work where the complexity of tasks can be learned by demonstration or repetition within 30 days with few variables, little judgment, and the supervision required is simple, direct and concrete.[9] The vocational expert testified that there are positions available in significant numbers in the national economy that Turner can perform - hand bander and production helper.[10] Turner's application was denied.[11]

After the Commissioner's Appeals Council denied a request for review, the ALJ's decision became a final decision for judicial review.[12] Turner filed this case to challenge the decision. In reviewing the decision, the Court must determine whether substantial evidence

---

[7]*Id.*

[8]*Id.* at p. 19.

[9]*Id.* at p. 20.

[10]*Id.* at p. 25.

[11]*Id.*

[12]*See Anderson v. Sullivan*, 959 F.2d 690, 692 (8th Cir. 1992) (stating, "the Social Security Act precludes general federal subject matter jurisdiction until administrative remedies have been exhausted" and explaining that the appeal procedure permits claimants to appeal only final decisions).

supports the decision and whether the ALJ made a legal error.[13]

Substantial evidence is "less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion."[14] For substantial evidence to exist in this case, a reasonable mind must accept the evidence as adequate to support the ALJ's denial of Turner's disability claim.[15]

**Turner's allegations.** Turner maintains that (1) the ALJ failed to fully and fairly develop the record; (2) there is not substantial evidence to support the ALJ's RFC and (3) the ALJ erred in addressing a Dictionary of Occupational Titles (DOT) conflict. These arguments are not persuasive.

**Record development.** Turner maintains that the ALJ failed to fully and fairly develop the record with respect to her T4 burst fracture. In the decision, the ALJ notes that on two separate occasions the physician treating Turner's T4 burst fracture opined that Turner is temporarily totally disabled.[16] The ALJ states, however, that the treating physician did not indicate that the disability would last for twelve months. Turner maintains that because the treating physician did not state whether the disability would last for twelve months, the ALJ was

---

[13]*See* 42 U.S.C. § 405(g) (requiring the district court to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner conformed with applicable regulations); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("We will uphold the Commissioner's decision to deny any applicant disability benefits if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled.").

[14]*Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010) (internal quotations and citations omitted).

[15]*Britton v. Sullivan*, 908 F.2d 328, 330 (8th Cir. 1990).

[16]SSA record at pp. 1390 & 1887.

under an obligation to contact the treating physician and obtain additional medical evidence on this issue. Failure to do so, according to Turner, constitutes failure to fully and fairly develop the record.

"While an ALJ does have a duty to develop the record, this duty is not never-ending . . . . The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."[17] The medical records reviewed by the ALJ with respect to Turner's disabilities are voluminous. The record contains progress notes that span from 2009 to 2013. There are more than sixty progress notes during this time, over twenty-five of which concern Turner's T4 burst fracture.[18] Additionally, there are over twenty-five reports of diagnostic testing performed on Turner, eight of which examined Turner's T4 burst fracture.[19] The record also contains opinion evidence. An initial Physical Residual Functional Capacity Assessment was completed by a state agency reviewing physician.[20] This assessment was later reviewed and affirmed by a separate state agency physician.[21]

A reasonable mind would accept the medical evidence presented as sufficient to determine whether Turner is disabled. Accordingly, the ALJ's decision to not obtain additional

---

[17]*McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (internal citations omitted).

[18]SSA record at pp. 1123, 1287, 1328, 1335, 1340, 1370, 1390, 1397, 1403, 1413, 1415, 1424, 1427, 1434, 1437-38, 1511, 1523-24, 1528-1531, 1537, 1539, 1549, 1885, 1887 & 1891-95.

[19]*Id.* at pp. 1133, 1139, 1142-43, 1376, 1401, 1407 & 1435.

[20]*Id.* at p. 1456.

[21]*Id.* at p. 1568.

medical evidence is supported by substantial evidence.

**RFC determination.** Turner asserts that the ALJ's RFC determination is not supported by substantial evidence because it is not supported by (1) the evidence related to Turner's T4 burst fracture; (2) the evidence related to Turner's mental impairments and (3) the evidence related to Turner's carpal tunnel. Upon reviewing all the evidence, the ALJ determined that Turner can perform light work except she can perform only occasional stooping, crouching, crawling and kneeling; cannot perform overhead reaching with the right upper extremity; can perform work where interpersonal contact is incidental to the work performed; and can perform work where the complexity of tasks can be learned by demonstration or repetition within 30 days with few variables, little judgment, and the supervision required is simple, direct and concrete.[22] The ALJ's RFC determination is supported by substantial evidence.

In July 2012, Turner was involved in a motor vehicle accident and sustained multiple injuries including a T4 burst fracture and a mildly distracted fracture of the C2 spinous process.[23] An initial determination was made to treat the fractures with a cervical thoracic orthotic device.[24] Turner's treating physician subsequently determined that surgery was necessary,[25] and in October 2012, Turner underwent surgery including an open reduction and internal fixation and a bone graft.[26]

---

[22]*Id.* at p. 20.

[23]*Id.* at pp. 1133-34 & 1137-38.

[24]*Id.* at p. 1123.

[25]*Id.* at pp. 1424 & 1511-12.

[26]*Id.* at pp. 1427-29.

As referenced above, the medical records contain two statements from Turner's treating physician that Turner is temporarily totally disabled due to her back injury.[27] The last such statement was made on January 17, 2013.[28] Also contained in the record are progress notes and hospital notes in which Turner rated her back pain as severe. This is not, however, where the review of the evidence ends.

Multiple notes contain observations that Turner was in no acute discomfort, even during appointments in which Turner asserted that she was in severe pain.[29] Further, none of the notes restrict Turner's movements. Turner's strength was documented at 5 out of 5 on August 16, 2012,[30] and 3 out of 5, for the left deltoids, on January 17, 2013.[31] She had normal tone and muscle mass for her age,[32] and exhibited a steady gait and adequate joint function.[33] Turner arose easily from a seated position and walked without difficulty.[34] She had a full range of motion in her neck.[35] The only restriction placed on Turner was one she identified herself. During a January 17, 2013, appointment, Turner stated that she could not lift her left shoulder above her

---

[27]*Id.* at pp. 1390 & 1887.

[28]*Id.* at p. 1887.

[29]*Id.* at pp. 1397, 1403, 1413, 1415, 1885, 1887 & 1893.

[30]*Id.* at p. 1403.

[31]*Id.* at p. 1887.

[32]*Id.* at pp. 1403 & 1894.

[33]*Id.* at pp. 1413, 1537, 1885, 1891 & 1893.

[34]*Id.* at pp. 1397, 1403, 1413, 1415, 1537, 1885, 1887 & 1891.

[35]*Id.* at p. 1373.

head.[36] At the same appointment, however, Turner stated that she was "doing better."[37] In an April 17, 2013, note, Turner stated that Soma and Flexeril provided relief in the past.[38, 39]

The diagnostic reports establish that although Turner suffered from a burst fracture, an injury that can certainly cause pain, the effects were only mild to moderate. Throughout the reports, words like "mild," "moderate," "subtle," "slight," "no significant," "subacute," and "stable" are used.[40] This language does not suggest a cause for disabling pain.

The records establish that Turner did not always follow the advice of her treating physician.[41] Upon discharge from the hospital following her July 2012 motor vehicle accident, Turner was instructed to wear the cervical thoracic orthotic *at all times*.[42] A note from St. Bernard's Medical Center on August 5, 2012, indicates that Turner had the orthotic in the room with her, but she was not wearing it.[43] The final instructions in the note read, "In addition, please wear your brace."[44] Following an August 16, 2012, appointment with Turner, her treating physician noted, "She is not wearing her external orthotic device. She states she wears it at all

---

[36]*Id.* at p. 1887.

[37]*Id.*

[38]*Id.* at p. 1892.

[39]Turner is currently prescribed Flexeril. *Id.* at p. 44.

[40]*Id.* at pp. 1133, 1139, 1142-43, 1376 & 1407.

[41]*Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir.2005) ("A failure to follow a recommended course of treatment ... weighs against a claimant's credibility.").

[42]SSA record at p. 1337.

[43]*Id.* at p. 1374.

[44]*Id.*

times. However, on this occasion it is in 'the car.'"[45] After determining that the T4 burst fracture progressed, the treating physician stated, "I have discussed with her and emphasized to her strongly the need to wear the orthotic device as directed."[46] Following her back surgery, Turner was referred for physical therapy, two times a week for three weeks.[47] The record, however, is void of records establishing that Turner attended the recommended physical therapy.

Also contained in the records are opinions from state agency physicians. After reviewing all the evidence, a state agency physician found that Turner can perform light work in which she occasionally lifts/carries 20 lbs, frequently lifts/carries 10 lbs, stands/walks about 6 hours in an 8 hour workday, sits about six hours in an 8 hour workday, and is unlimited in pushing/pulling.[48] He further assessed the following limitations: occasional climbing ladder/rope/scaffolds, occasional stooping and occasional crouching.[49] This opinion was affirmed by a second state agency physician.[50] It is important here to note that, in reviewing this opinion evidence, the ALJ determined that the restrictions were not sufficient, and constructed an RFC with even greater limitations than those assessed by the state agency physicians.[51]

With respect to the evidence relating to Turner's T4 burst fracture, a reasonable mind

---

[45] *Id.* at p. 1403.

[46] *Id.*

[47] *Id.* at p. 1539.

[48] *Id.* at p. 1457.

[49] *Id.* at p. 1458.

[50] *Id.* at p. 1568.

[51] *Id.* at p. 24.

would accept the evidence as adequate to support the determination that Turner can perform light work with the limitations assessed by the ALJ.

Turner attended mental therapy sessions in 2011 and 2012. In many of these notes, Turner's mood is listed as anxious and/or depressed.[52] In a large number of these notes, however, Turner indicated that she was making some progress.[53] In June 2011, Turner maintained that she was having only "some anxiety."[54] In August 2011, Turner stated that she thought she was "good."[55] A September 2011 note indicates that Turner felt stable and had been so for about two months.[56] At that time she was walking three to four times a day and felt confident about caring for her son.[57]

In the majority of the progress notes Turner's treating physician and nurses made the following observations about Turner:

- alert and cooperative;

- oriented to person, place and time;

- logical and linear thought;

- thought content and cognitive functioning at baseline;

- fair judgment and insight;

---

[52]*Id.* at pp. 512, 518, 881, 903, 908 & 918.

[53]*Id.* at pp. 897, 902, 912, 917, 921 & 1073

[54]*Id.* at p. 888.

[55]*Id.* at p. 518.

[56]*Id.* at p. 902.

[57]*Id.*

- speech within normal limits; and

- no suicidal or homicidal ideations.[58]

Turner's mood was documented in August 2011 as good and stable with meds.[59] A January 2012 note states that Turner "continues to be stable without report of drugs or alcohol and states she has been stable in home for over 1 year . . . progress good . . . ."[60] In April 2012, it was again noted that Turner's mood was good and stable.[61]

Throughout Turner's mental health treatment, the medications prescribed remained consistent. From May 2011 until October 2011, Turner was prescribed Seroquel, Prozac and Neurontin.[62] In October 2011, after testing positive for methamphetamine, cocaine, THC, benzodiazepines, and amphetamine, Turner's treating physician discontinued all prescription medications.[63] In November 2011, Turner tested positive for benzodiazepines and was again denied any prescription medication.[64] In January 2012, Turner's drug tests were negative and her prescription medication needs were reevaluated.[65] At that time she was prescribed Celexa and

---

[58]*Id.* at pp. 518, 881, 884, 888, 896, 901, 903, 906, 908, 913-16, 918-19, 924-25, 928-29, & 932.

[59]*Id.* at p. 898.

[60]*Id.* at p. 921.

[61]*Id.* at p. 928.

[62]*Id.* at pp. 512, 518, 888, 898, 903 & 908.

[63]*Id.* at p. 911.

[64]*Id.* at p. 913.

[65]*Id.* at p. 918.

Neurontin.[66] Those prescriptions remained consistent throughout the remainder of her mental health medical records.[67]

The notes seem to establish that much of Turner's stress and anxiety stem from family issues. In describing Turner's reasons for treatment and her mood, many notes recite facts about Turner's family situation.[68] The Arkansas Department of Human Services (DHS) was monitoring Turner and her children.[69] At one point one or both of her children were placed in foster care.[70] On another occasion, her daughter ran away for a number of weeks.[71] While this does not diminish the anxiety and depression felt by Turner, it supports the ALJ's observation that Turner's symptoms were responses to her family situation.

The ALJ recognized the opinions contained in a March 3, 2011, psychological evaluation of Turner completed for DHS to determine intervention strategies for Turner and her children.[72] The examining psychologist observed that Turner was oriented to person, place and time and demonstrated no perceptual abnormalities.[73] She had no suicidal or homicidal ideations.[74] She

---

[66]*Id.*

[67]*Id.* at pp. 922, 924 & 928.

[68]*Id.* at pp. 518, 880, 897-98, 902-03, 907, 911, 916-18, 921-22 & 1073.

[69]*Id.* at p. 1073.

[70]*Id.* at pp. 880, 897, 898, 902, 918 & 921.

[71]*Id.* at pp. 903 & 1020.

[72]*Id.* at p. 501.

[73]*Id.* at p. 504.

[74]*Id.*

appeared, however, somewhat unstable and was unable to delineate a plan to make things better.[75] The psychologist opined that Turner was experiencing depression and anxiety at a level that was profound.[76] In conclusion, the psychologist stated that "[Turner] is presently psychologically overwhelmed by her emotional distress and it significantly compromises her ability to provide safe and stable parenting . . . ."[77] The ALJ granted this opinion little weight, as he found that Turner's condition improved when compliant with treatment, her symptoms appeared to increase during periods of family stress and her condition responded well to therapy and medications.[78]

Also contained in the record is a Mental Residual Functional Capacity Assessment in which the state physician determined that Turner is not significantly limited in the majority of functional capacities listed.[79] The state physician concluded that Turner is "able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled)."[80] The ALJ placed such a limitation on Turner in the RFC.[81]

---

[75]*Id.*

[76]*Id.* at p. 505.

[77]*Id.*

[78]*Id.* at p. 24.

[79]*Id.* at p. 1041.

[80]*Id.* at p. 1042.

[81]*Id.* at p. 20.

In her brief, Turner turns the Court's attention to her Global Assessment of Functioning (GAF) scores contained throughout the record. In a number of the mental health notes, Turner's GAF score was 45.[82] As Turner progressed with treatment, however, her GAF score overall improved, with multiple occasions of scores of 48, 50 and 54.[83] This supports the ALJ's conclusion that while Turner was compliant with attending treatment, her GAF, and indeed her mental health, improved.

What is telling in the record is what is missing. Although Turner's mental health appointments appeared routine in 2011 and the early part of 2012, she discontinued those sessions following her May 2012 appointment. Indeed, although Turner was subsequently seen by multiple medical professionals for various issues, there is often little - or no - mention of her mental health in their observations and progress notes. If mental health was addressed, it was limited to a one line listing in Turner's medical history. The fact that subsequent to May 2012 Turner did not seek treatment for her mental impairments weighs against her allegations that her mental impairments are disabling.[84]

Further, the record contains evidence that Turner did not always attend her scheduled therapy sessions. In August 2011, Turner was confronted with the fact that she misrepresented the frequency of her sessions to a psychological examiner.[85] Turner afterward agreed to start

---

[82]*Id.* at pp. 514, 519, 882, 900, 904, 909 & 1073.

[83]*Id.* at pp. 897, 907, 914, 920-22, 925 & 930.

[84]*Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th cir. 1997) (failing to seek medical assistance for alleged physical and mental impairments contradicted claimant's allegations of disabling conditions and supported unfavorable decision).

[85]SSA record at p. 522.

keeping her scheduled appointments.[86]

As to Turner's mental impairments, a reasonable mind would accept the evidence as adequate to support the determination that Turner can perform light work with the limitations assessed by the ALJ.

Turner asserts that the ALJ should have included manipulative restrictions in the RFC due to her carpal tunnel. The medical records relating to Turner's carpal tunnel are limited. Although an April 2011 report states that Turner suffers from moderately severe carpal tunnel in the left upper extremity, it concluded that there is no other evidence of entrapment neuropathy or polyneuropathy.[87] Additionally, Turner's left ulnar and radial nerve studies otherwise appeared normal.[88] Subsequent to this report, there is little mention of carpal tunnel. In March 2012, Turner is instructed to make an appointment with ortho.[89] There is nothing in the record to indicate that such an appointment occurred. As to Turner's carpal tunnel, a reasonable mind would accept the evidence as adequate to support the determination that Turner can perform light work with the limitations assessed by the ALJ. The RFC determination is supported by substantial evidence.

**Conflict with the Dictionary of Occupational Titles**. Turner argues that a conflict exists between the vocational evidence and the DOT. According to Turner, the VE identified jobs which exceed a nonexertional requirement - the limitation of over head reaching with the

---

[86]*Id.*

[87]*Id.* at p. 508

[88]*Id.*

[89]*Id.* at p. 334.

right upper extremity - of the RFC. Turner maintains that both positions of hand bander and production helper require reaching. Therefore, the VE's testimony that Turner can perform such jobs is in conflict with the DOT. The regulations require the ALJ to question the VE about any conflict between the VE's opinion and the information contained in the DOT. If a conflict exists, the ALJ must obtain a reasonable explanation for the conflict.[90]

An ALJ's failure to question the vocational expert about conflicts between his testimony and the DOT is harmless if no conflict exists.[91] No conflict exists in this case with respect to the hand bander position because the DOT does not include reaching in that job description.[92] Further, it is possible that some hand bander positions involve frequent reaching, but the DOT's job descriptions are "generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."[93] "[N]ot all the jobs in every category have requirements identical to or as rigorous as those listed in the DOT."[94]

Additionally, it is apparent from the hearing transcript that the VE specifically excluded positions that require overhead reaching. At one point the VE states that with the assigned RFC, Turner can perform the job of motel maid.[95] The VE, however, corrects himself stating that

---

[90]*See Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007).

[91]*Id.*

[92]Turner's argument likely stems from Job Browser Pro job descriptions.

[93]*Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) ("[T]he DOT, in its job definition, represents approximate maximum requirements for each position rather than the range.").

[94]*Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997).

[95]SSA record at p. 47.

Turner cannot perform that job because it requires overhead reaching.[96]

An error was committed with respect to the production helper position. The VE testified to the wrong DOT number for the position of production helper.[97] The VE stated that the DOT number for production helper is 539.587-010, but that number provides the description for laborer, rags/apron operator. This error is not identified by the ALJ, Turner or the Commissioner. Without the correct DOT number, the Court is unable to analyze the issue of conflict. The error, however, is harmless. To find otherwise, "[the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred."[98] That is, to show harmful error, the claimant must show the ALJ may have decided differently without the error. The claimant cannot show the ALJ may have decided the matter differently because the VE identified a second position that is available to Turner in the national economy - hand bander. Therefore, even if the VE identified the correct DOT number for production helper, and the description of production helper included overhead reaching, Turner's application would still be denied because the position of hand bander exists in the national economy and meets the RFC prescribed by the ALJ.

No conflict exists between the hand bander position identified by the VE and the DOT. The ALJ presented the VE with a hypothetical including all of the restrictions contained in the

---

[96]*Id.*

[97]*Id.* at p. 48

[98]*Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012).

RFC, and the VE identified a position that meets those requirements.[99] With respect to the production helper position, an error was committed, but that error was harmless.

**Conclusion.** Substantial evidence supports the ALJ's decision. Legal error was committed with respect to the identified position of production helper, but the error was harmless. For these reasons, the court DENIES Turner's request for relief (docket entry # 2) and AFFIRMS the Commissioner's decision.

It is so ordered this 3rd day of September, 2014.

_____
UNITED STATES MAGISTRATE JUDGE

---

[99]SSA record at pp. 46-48.